## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| JAMIE TROEGER, Administrator of the<br>Estate of Gayle Mitchell, Deceased,<br><br>Plaintiff,<br><br>v.<br><br>MINNESOTA LIFE INSURANCE<br>COMPANY,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)   Case No. 14-1083<br>)<br>)<br>)<br>)<br>) |

## ORDER AND OPINION

This matter is now before the Court on Defendant's Motion [15] for Summary Judgment. For the reasons set forth below, Defendant's Motion [15] is Denied.

### BACKGROUND

The following facts are not in dispute.  On July 20, 2002, Michael Mitchell fractured his neck after falling head-first into Kickapoo Creek. The fracture resulted in quadriplegia, or paralysis of all four extremities. In September 2005, Michael became a resident at Rose Garden Care Center ("Rose Garden"), a residential care facility in Peoria Heights, Illinois. He developed several medical conditions after his paralysis, including seizure disorder, depression, hypertension, obesity, dyslipidemia, bowl mobility disorder, gastroesophageal reflux disease ("GERD"), deep venous thrombosis, spasticity and chronic pain.

On at least four occasions between 2005 and 2006, Michael was found "non-responsive" by caretakers at Rose Garden. On June 24, 2006, Michael was admitted to the intensive care unit at Proctor Hospital for respiratory failure after he became unresponsive and stopped breathing during ambulance transport to the hospital. In August 2006, Michael was transferred to OSF

1

Saint Francis Medical Center ("OSF") when he was found unresponsive and caretakers were unable to feel a pulse. Michael was again found unresponsive by Rose Garden caretakers and transferred to OSF in September 2006. On each occasion he was successfully resuscitated.

On July 28, 2007, Michael began "actively seizing" at Rose Garden. He was initially breathing on his own, but stopped breathing. Rose Garden called paramedics, and Advanced Medical Transport ("AMT") transferred Michael to OSF Hospital. AMT paramedics documented Michael's condition during transport, noting "no evidence of trauma" in any location and an "unremarkable" physical examination.[1] ECF Doc. 16, ¶ 22. When paramedics attempted to intubate Michael, they suctioned his airway and aspirated foreign material. ECF Doc. 28, at 13. Michael could not be resuscitated and died at OSF Hospital. Dr. Richard C. Frederick was the emergency room physician who treated Michael at OSF on July 28, 2007. Dr. Frederick signed the medical records prepared by a resident which noted, under the heading of *Initial Physical Exam*, "General—no evidence of trauma . . . Head/Neck—atraumatic . . . Extremities—no signs of trauma." See ECF Doc. 16-10. Those records also indicated that Michael had vomit on his face. On October 18, 2007, a Coroner's Inquest into Michael's death was held by Peoria County Coroner Johnna Ingersoll. The jury found that Michael's death was "natural" from "seizure disorder."

---

[1] Local Rule 7.1(D)(2)(b) provides that responses to motions for summary judgment must state, in separate subsections, undisputed material facts, disputed material facts, disputed immaterial facts, undisputed immaterial facts, and additional material facts. Local Rule 7.1(D)(2)(b)(6) cautions that "[a] failure to respond to any numbered fact will be deemed an admission of the fact." *Id.* This rule consistent with the Federal Rules of Civil Procedure, which provide that when a party who fails to properly address another party's assertion of fact as required by Rule 56(c), the court may, *inter alia*, "consider the fact undisputed for the purposes of the motion." Fed. R. Civ. Pro. 56(e)(2). Here, in addition to Plaintiff's failure to comply with the formatting requirements of Local Rule 7.1(D)(2), Plaintiff failed to respond to Defendant's 22nd statement of fact. See ECF Doc. 24, at 4-5. Accordingly, the Court will consider the statement undisputed. See *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994) ("[D]istrict courts are not obligated in our adversary system to scour the record looking for factual disputes and may adopt local rules reasonably designed to streamline the resolution of summary judgment motions.").

Michael, as a former employee of the State of Illinois, obtained life insurance coverage under a group policy for state employees. The life insurance policy was issued by Minnesota Life Insurance Company ("Minnesota Life") and included Accidental Death and Dismemberment ("AD&D") coverage. Minnesota Life paid Michael's wife, Gayle Mitchell, $156,500 pursuant to the policy's Basic Life and Optional Life coverage. However, Minnesota Life declined to pay the additional $156,500 under the AD&D double indemnity provision. The AD&D provision of the policy states:

> Accidental death or dismemberment by accidental injury as used in this supplement means that your death or dismemberment results, directly and independently of disease or bodily infirmity, from an accidental injury which is unexpected and unforeseen.

ECF Doc. 16, ¶ 10.

The policy also stated "injury must occur while your coverage under this supplement is in force" and "death or dismemberment must occur within 365 days after the date of the injury and while your coverage under this supplement is in force." *Id.*; ECF Doc. 16-1, at 27. The AD&D policy further provided that "[i]n no event will [Minnesota Life] pay the accidental death or dismemberment benefit where your death or dismemberment results from or is caused directly by any of the following . . . (3) bodily or mental infirmity, illness or disease; or (4) medical or surgical treatment . . . ." *Id.*

## LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is mandated "after adequate time for discovery and

upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id*. at 322-23. However, "[t]he burden on the non-movant is not onerous." *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994). Rather, the non-movant "need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact" and "may rely on affidavits or any other materials of the kind identified in Rule 56(c)." *Id*.

"The interpretation of an insurance policy is a matter of state law." *Westfield Ins. Co. v. Vandenberg*, 796 F.3d 773, 777 (7th Cir. 2015). In Illinois, "an insurance policy is a contract, and the general rules governing the interpretation of other types of contracts also govern the interpretation of insurance policies." *Id.*, citing *Hobbs v. Hartford Ins. Co. of the Midwest*, 214 Ill. 2d 11, 17 (2005). When the language in an insurance policy is unambiguous, "the policy will be applied as written, unless it contravenes public policy." *Hobbs*, 214 Ill. 2d at 17. However, when the language of an insurance policy is subject to more than one reasonable interpretation, the policy is ambiguous. *Id*. "Although policy terms that limit an insurer's liability will be liberally construed in favor of coverage, this rule of construction only comes into play when the policy is ambiguous." *Id*. When a policy is ambiguous, "and if, after considering the contract language in light of parol evidence and rules of construction, doubt still remains as to the meaning of the contract, then the question of interpretation must be left to the trier of fact." *Bourke v. Dun & Bradstreet Corp.*, 159 F.3d 1032, 1037 (7th Cir. 1998) (citing *Countryman v. Indus. Com'n*, 292 Ill. App. 3d 738, 741 (1997)).

## ANALYSIS

Minnesota Life asserts that summary judgment in its favor is appropriate for two reasons. First, Minnesota Life argues that "[t]he existence of an injury is a threshold requirement of the AD&D coverage," and "[t]he only injury shown by the evidence is Mitchell's broken neck." ECF Doc. 16, at 10. Thus, because Michael's death occurred five years after he injured his neck, his injury fell "squarely outside of the Group Policy's AD&D coverage," the terms of which require that death "occur within 365 days after the date of injury." *Id*.

Second, Minnesota Life argues that Plaintiff has failed "to establish any evidentiary link between a purported injury, choking, and a death that results independently of disease or bodily infirmity." *Id*. at 13. Minnesota Life further claims that "[i]f Mitchell's purported choking occurred while seizing, death did not result directly and independently of his seizure disorder." Thus, "Plaintiff's allegation of choking fails to establish any injury, and she lacks any evidence to demonstrate that the alleged choking resulted independently of (i) Mitchell's seizure disorder, and actively seizing at the time of his death; (ii) his compromised ability to move to protect his airway due to his bodily infirmity and tetraplegia; (iii) his gastroesophageal reflux disease that significantly increases the risk of vomiting; or (iv) any of Mitchell's other numerous medical conditions." *Id*. at 13-14.

In response, Plaintiff asserts that "[t]here is a triable issue of fact on whether Mitchell accidentally aspirated food or vomit down his trachea which caused him to asphyxiate and have respiratory cardiac arrest as Dr. Frederick testified[,] which was an accidental injury that was sudden or unforeseen." ECF Doc. 24, at 13. Additionally, Plaintiff asserts that the policy's requirement that death result "directly and independently of disease or bodily infirmity" is not

5

part of the definition of accidental death—on which Plaintiff bears the burden of establishing—but rather provides an exclusion to coverage that Minnesota Life must prove to defeat recovery.

**(1) Whether Michael Sustained an Accidental Injury**

At issue in this case is the cause of Michael's death on July 28, 2007. In Illinois, "[t]he insured has the burden of proving that his loss comes within the terms of his insurance policy." *Roberts v. Allstate Life Ins. Co.*, 243 Ill. App. 3d 658, 660 (1993); *Kolowski v. Metro. Life Ins. Co.*, 35 F. Supp. 2d 1059, 1061 (N.D. Ill. 1998). The AD&D policy provides that "death or dismemberment results, directly and independently of disease or bodily infirmity, from an accidental injury which is unexpected and unforeseen." ECF Doc. 16-1, at 27. The parties first dispute whether Michael sustained an "accidental injury" as the term is used in the policy.

*(a) Interpretation of Accidental Injury Insurance Provisions Under Illinois law*

"An accident is something which happens by chance or fortuitously, without intention or design, and which is unexpected and unforeseen." *Connecticut General Life Ins. Co. v. Aguilar*, 579 F. Supp. 1201, 1204 (N.D. Ill. 1983) (citing *Taylor v. John Hancock Ins. Co.*, 11 Ill. 2d 227, 230 (1957)). Illinois courts have adopted a liberal interpretation of the phrase "accidental means" in insurance policies, construing the term to be synonymous with "accidental result." *Russell*, 108 Ill. App. 3d at 420 (citing *Taylor*, 11 Ill. 2d at 230)). In Illinois, "the concept of causation with respect to the analysis of life insurance policies is more circumscribed than in tort law . . . only the immediate cause of the insured's death matters . . . not any underlying illness or infirmities that might have contributed to the death by producing the conditions necessary for death to occur." *Schroeder v. Minnesota Life Ins. Co*., Case No. 06-2915, 2007 WL 1169706 at*2-4 (N.D. Ill. 2007) (citing *Russell v. Metro. Life Ins. Co.*, 108 Ill. App. 3d 417 (1982)). In other words, Illinois courts "need not seek out . . . the cause of the cause." *Russell*, 108 Ill. App.

3d at 419 (citing *Marsh v. Metropolitan Life Ins. Co*., 70 Ill. App. 3d 790, 796 (1979)). Since

contract language that is otherwise ambiguous may become unambiguous "because it has

acquired an established legal meaning," the Court will first look to Illinois cases interpreting

accidental injury provisions in insurance policies. *Rich v. Principal Life Ins. Co.*, 226 Ill. 2d 359,

373 (2007).

      In *Marsh v. Metropolitan Life Insurance Company*, the appellate court reversed a

judgment in favor of the insurer in a suit for additional indemnity under an accidental death

provision in the insurance policy. 70 Ill. App. 3d 790, 796 (1979). The insured died as a result of

a heroin overdose. The policy provided:

> If, while insured under the Group Policy for insurance for Death or
> Dismemberment by Accidental Means, the Employee sustains *bodily injuries
> solely through accidental means*, and within 365 days thereafter suffers (loss of
> life) as a direct result of such bodily injuries independently of all other causes, the
> Insurance Company shall pay the amount of insurance specified for such loss . . .
> provided, however, that in no case shall any payment be made for death or any
> other loss which is:
> > (A) caused or contributed to by disease or bodily or mental infirmity, or by
> > medical or surgical treatment or diagnosis thereof, or
> > (B) caused by or resulting from intentional self-destruction or intentionally
> > self-inflicted injury, while sane or insane.

*Marsh*, 70 Ill. App. 3d at 791 n.1 (emphasis added).

The court noted that "[u]nder the Illinois cases recovery is permitted for a death if that result is

accidental even though the means of destruction, here the injection of heroin, is intentional." *Id*.

Reversing the judgment in favor of the insurer, the court concluded that the insured's death

"from an unintended overdose of heroin" was an injury that "must be regarded as an 'accident' as

a matter of law in interpreting the instant insurance policy." *Id*. at 794.

      In *Russell v. Metropolitan Life Insurance Company*, the appellate court affirmed the grant

of summary judgment in favor of the plaintiff in a suit for additional indemnity under an

accidental death provision in the life insurance policy. 108 Ill. App. 3d 417 (1982). In that case, the insured was found dead in his truck next to a bottle of vodka. The parties stipulated that the insured's death resulted from the consumption of a lethal quantity of alcohol. *Id*. at 418. The insurance policy provided for additional indemnity "for an insured employee who sustained 'bodily injuries solely through accidental means'" and excluded from coverage deaths "caused or contributed to by disease." *Id*. Affirming the trial court's grant of summary judgment in favor of the plaintiff, the court reasoned:

> In the present case, the immediate cause of decedent's death was the lethal content of alcohol in his body. While alcoholism might have provided the desire to drink, mere desire does not stop a heart or cause the lungs to cease functioning. Therefore, alcoholism can only be considered a *remote* cause and not a contributing cause of death. Had defendant submitted evidence that alcoholism had rendered decedent's body less capable of surviving the dose of alcohol ingested, there would have been a question as to whether a disease contributed to decedent's death. No such evidence was presented.

*Russell*, 108 Ill. App. 3d at 419.

In *Carney v. Paul Revere Life Insurance Company*, the appellate court affirmed the trial court's grant of summary judgment in favor of the insured in a suit for additional coverage under a disability insurance policy. 359 Ill. App. 3d 67 (2005). The insured, a surgeon, developed pronator teres syndrome (similar to carpal tunnel syndrome) as a result of repetitive trauma from performing surgery. *Id*. at 71. The disability insurance policy provided benefits through age 65 for total disability due to "sickness" and lifetime benefits for total disability due to "injury." The policy defined "injury" as "accidental bodily injury sustained while this policy is in force," whereas "sickness" was defined as "sickness or disease which first manifests itself while this policy is in force." *Id*. at 69. The issue before the appellate court was "whether pronator teres syndrome, from which Dr. Carney suffers, was caused by 'sickness,' in which case Dr. Carney has received the policy's full benefit, or alternatively, whether it was caused by an 'accidental

8

bodily injury,' in which case Dr. Carney is entitled to receive a lifetime benefit pursuant to the policy schedule." *Id*. at 72-73.

On appeal, the insurer argued that the trial court erred in classifying the insured's pronator teres syndrome as an injury because "he did not sustain any discrete trauma that resulted in his neuropathy, nor did an unusual event or cataclysmic occurrence trigger [plaintiff's] condition." *Id*. at 73. The court was persuaded by the Illinois Supreme Court's opinion in *Zurich Insurance Company v. Raymark Industries, Inc.*, 118 Ill. 2d 23 (1987), which held that "a 'bodily injury' occurs when asbestos fibers are inhaled and retained in the lung." Applying *Zurich* to Paul Revere's disability policy, the appellate court stated:

> We find *Zurich* instructive. As in *Zurich*, where each inhalation of asbestos was found to constitute a "bodily injury," here, we find that each repetitive trauma experienced by [plaintiff] was a "bodily injury."

> *Carney*, 359 Ill. App. 3d at 75.

Finally, in *Rich v. Principal Life Insurance Company* the Illinois Supreme Court affirmed the appellate court's reversal of the trial court's grant of summary judgment in favor of the insured in a suit for benefits under a disability insurance policy. 226 Ill. 2d 359 (2007). In that case, the insured injured his wrist loading a tire onto a truck. After surgery to repair a torn ligament, the insured developed an infection around the incision. *Id*. at 363-64. Treatment with antibiotics failed, and a subsequent surgery was required to remove necrotic portions of the bone. Two years after the initial surgery, the insured underwent a wrist fusion surgery. *Id*. at 364-65.

The disability insurance policy provided monthly benefits "if Total Disability (as that term is defined in this policy) of the Insured commences while the Policy is in force." *Id*. at 362. The policy defined "Total Disability" as "the complete inability of the Insured due to Injury or Sickness to perform any and every duty pertaining to an occupation . . . ." *Id*. The policy further

provided that "INJURY means accidental bodily injury sustained by the Insured while this Policy

is in force. Injury which is a direct or indirect result of physical or mental infirmity, illness or

disease of any kind, or medical or surgical treatment therefor or Injury which results in Total

Disability which commences more than 90 days after the date of the Injury is sustained will be

deemed to be Sickness." *Id*. The policy provided for lifetime benefits if the insured's disability

resulted from an "injury," but limited benefits to five years if the disability was the result of

"sickness." *Id*. at 363. The plaintiff sued after he was denied lifetime benefits.

The appellate court reversed the trial court's grant of summary judgment for the insured,

holding that the insured's claim fell within the definition of "sickness" under the policy's 90-day

limitations period and "medical or surgical treatment" provision. *Id*. at 375. The Illinois Supreme

Court agreed:

> The controlling principles are widely recognized. The secondary results of
> an accident do not break the causal connection thereto. "Accordingly, the fact that
> an insured incurs an infection or disease following an accident does not break the
> thread of causation from the accident to the ultimate result where such infection
> or disease is the result of the accident." Couch on Insurance 3d § 139:30, at 139-
> 68 through 139-69 (1998). In other words: "If the insured has received an injury
> covered by the contract which has necessitated an operation, the performance of
> the operation does not, in itself, constitute an independent intervening cause nor
> prevent the accident from remaining the proximate cause of death [or disability]."
> 1B J. Appleman & J. Appleman, Insurance Law & Practice § 412, at 175-76
> (1981). . . . [W]here an accidental injury leads to medical complications, which in
> turn lead to the covered loss, the "accident" is the event that caused the original
> injury—the "accident" is not the development of medical complications. *Jurrens
> v. Hartford Life Insurance Co.*, 190 F.3d 919, 923 (8th Cir. 1999) (applying South
> Dakota law).

*Rich*, 226 Ill. 2d at 376.

*(b) Dr. Bosacker's Report and Dr. Frederick's Deposition*

In the instant case, the parties have presented conflicting evidence as to the cause of

Michael's death. Both parties agree that Michael began seizing at Rose Garden and subsequently

10

stopped breathing. ECF Doc. 16, at ¶ 21; ECF Doc. 24, at ¶ 21. Reports prepared by paramedics during transport and physicians at the hospital state that a physical exam of Michael was "unremarkable" and he presented with "no signs of trauma." ECF Doc. 16, at ¶¶ 22, 24; ECF Doc. 24, at 5. However, those reports also indicate that paramedics aspirated "foreign matter" from Michael's airway and the emergency room physician observed large amounts of vomit on his face. ECF Doc. 24, at ¶¶ 11-12; ECF Doc. 28, at 7-8.

Defendant's medical expert, Dr. Bosacker, submitted a declaration summarizing Michael's medical records and opining on the cause of his death. ECF Doc. 28-1. According to Dr. Bosacker, "the emergency department records indicate Mr. Mitchell was breathing spontaneously after being found seizing and that he stopped breathing at 1720." *Id*. at 4. The report states that "there was no indication . . . that his airway was occluded" and "no documentation of removal of foreign material from Mr. Mitchell's airway that may have been blocking his airway or causing him to choke."[2] *Id*. Dr. Bosacker opined that "[t]he cause of Mr. Mitchell's death is not certain" and "[a]ny of [his medical conditions] or an unrecognized diagnosis may have caused his death." *Id*. Her report concludes that the records she reviewed were "consistent with and support" the cause of death identified on the death certificate, which indicated "Mr. Mitchell's cause of death was seizure disorder with contribution from deep venous thrombosis and hypertension . . . ." *Id*. at 5.

Treating physician Dr. Richard Frederick's deposition testimony reveals a difference of opinion as to the cause of Michael's death. After reviewing the EMT and hospital records, Dr. Frederick testified that the paramedics' attempt to intubate Michael was unsuccessful and they

---

[2] Dr. Bosacker's conclusion that "there was no indication" and "no documentation" of an occluded airway or removal of foreign material is unsupported by the record. See ECF Doc. 16-14, at 5 (AMT record indicating airway was "partially obstructed" and indicating the obstruction was "vomitus").

removed aspirated[3] foreign material from his airway. ECF Doc. 18-9, at 6. This aspirated foreign

material—either food or vomit—can significantly compromise respirations in small amounts,

and large amounts of aspirate can completely block the airway. *Id*. at 7. Dr. Frederick stated that

he did not notice any traumatic injuries on Michael. *Id*. at 8. He disagreed with the coroner's

determination that Michael's death was caused by seizure disorder, stating that while seizure

disorder "may have played a role into it . . . a seizure should not cause you to die" unless you

seize for a very long time. *Id*. at 9. He acknowledged that Michael's quadriplegia and seizure

disorder decreased his ability to protect his airway, and his gastroesophageal reflux disease "put

him in a higher risk for vomiting." *Id*. at 11, 17. Although Dr. Frederick had no independent

recollection of Michael's treatment, he "would have assumed that his cause of death was a

respiratory arrest likely due to the aspiration" based on his review of the hospital records. *Id*.

#### (c)  *Michael Sustained an Accidental Injury*

Minnesota Life claims that "[t]he only injury shown by the evidence is [Michael's]

broken neck, suffered at Kickapoo Creek in July 2002 that resulted in his tetraplegia." ECF Doc.

16, at 15. Since Michael injured his neck five years before his death, Minnesota Life contends

that his injury fell "squarely outside of the Group Policy's AD&D coverage" requirement that

death occur within 365 days of the injury. *Id*. In support of its position, Minnesota Life points to

the paramedic and hospital records that indicate Michael did not display any signs of physical

trauma. See ECF Doc. 16, at ¶¶ 22, 24.  Minnesota Life argues that "[i]n the absence of any

evidentiary link to the underlying basis for the aspiration, whether [Michael] aspirated fails to

---

[3] Aspiration is defined as: 1. the drawing of a foreign substance, such as the gastric contents, into the respiratory
tract during inhalation. 2. removal by suction, using an aspirator, as of excess fluid or gas from a body cavity or of a
specimen for biopsy. *Aspiration Definition*, DORLANDS.COM, http://dorlands.com/def.jsp?id=100009589 (last visited
July 29, 2016) Here, Plaintiff and Dr. Frederick use the two definitions interchangeably, i.e., "paramedics aspirated
[suctioned] foreign material from his airway" and "Michael aspirated [vomited] into his airway."

establish evidence of any injury or basis for death that is relevant to whether his death comes within the AD&D coverage." ECF Doc. 28, at 7. Because Michael did not exhibit signs of physical trauma, Minnesota Life contends that he did not suffer an "injury" as required for coverage under the AD&D policy.

Minnesota Life's argument that Michael did not suffer an injury because he did not exhibit visible signs of physical trauma is unsupported by Illinois case law interpreting the term "accidental injury" in the context of life and disability insurance policies. In *Marsh*, the appellate court held that the insured's death from an overdose of heroin fell within the policy's coverage for death that results directly from "bodily injuries solely through accidental means . . . ." 70 Ill. App. 3d at 796. Similarly, in *Russell*, the appellate court held that the insured, an alcoholic whose death resulted from consumption of a lethal amount of alcohol, died solely through "accidental means" within the meaning of the insurance policy providing additional indemnity for "bodily injuries solely through accidental means." 108 Ill. App. 3d at 417-19. The court acknowledged that alcoholism was a "disease" within the meaning of the policy exclusion for deaths "caused or contributed to by disease," but reasoned that alcoholism "can only be considered a *remote* cause and not a contributing cause of death." *Id*. at 419 (noting that "[w]hile alcoholism may have provided the desire to drink, mere desire does not stop a heart or cause the lungs to cease functioning").

Notably absent from the discussion in *Marsh* or *Russell* is a requirement that the insured must present with visible signs of physical "trauma" in order to establish an injury under the policy. Cf. *Landress v. Phoenix Mut. Life Ins. Co.*, 291 U.S. 491 (1934) (affirming judgment for insurer where decedent suffered sunstroke while playing golf, reasoning that policy providing recovery for death resulting from injuries effected through "*external, violent and accidental*

13

*means*" indicated the insurer's "carefully chosen words" distinguishing accidental means from accidental results) (emphasis added). And unlike the policy in *Landress*, Minnesota Life's policy does not limit coverage to accidental injuries which are "external" or "violent." *Id*.

In *Carney*, the appellate court rejected the insurer's argument that the trial court erred in classifying the insured's pronator teres syndrome as an injury because "he did not sustain any discrete trauma that resulted in his neuropathy, nor did an unusual event or cataclysmic occurrence trigger Dr. Carney's condition." 359 Ill. App. 3d at 73. Rather, the court found that the insured's disability "was the result of repetitive trauma, each of which may be classified as an 'injury.'" *Id*. at 76. Finally, in *Rich* the Illinois Supreme Court distinguished the insured's injury from the surgeon's injury in *Carney*, stating that *Carney* was inapposite "because [it] did not involve a plaintiff's injury that resulted from medical or surgical treatment." 226 Ill. 2d at 359. When "an accidental injury leads to medical complications, which in turn lead to the covered loss, the 'accident' is the event that caused the original injury—the 'accident' is not the development of medical complications." *Id*. at 376 (citing *Jurrens v. Hartford Life Insurance Co.*, 190 F.3d 919, 923 (8th Cir. 1999)). Thus, because the insured became disabled more than 90 days after the injury, the claim fell outside of the policy's time limitation and was properly denied. *Id*. at 376-77.

*Marsh*, *Russell*, and *Carney* are at odds with Minnesota Life's interpretation of "injury." In both *Marsh* and *Russell*, the insureds died as a result of an overdose. In both cases, it is reasonable to assume that the decedents lacked visible signs of physical trauma. See *Marsh*, 70 Ill. App. 3d at 791 (insured found dead, sitting of floor of bedroom with needle in arm); *Russell*, 108 Ill. App. 3d at 418 (insured found dead in his truck next to bottle of vodka).Yet in both cases, the court found that the insured suffered an "accidental injury" within the meaning of the life

insurance policies. Similarly, the court in *Carney* found that the surgeon's pronator teres syndrome was an "injury" within the meaning of the disability insurance policy, despite the fact that the insured "did not sustain any discrete trauma . . . unusual event or cataclysmic occurrence . . . ." 359 Ill. App. 3d at 73. And *Rich* is distinguishable from the instant case because Michael's aspiration was not the result of medical or surgical treatment. *Rich*, 226 Ill. 2d at 359.  Here, it is undisputed that Michael was found unresponsive with vomit on his face, that he was initially breathing on his own but then stopped breathing, and the paramedics suctioned his airway and aspirated "foreign material." See ECF Doc. 28, at 18. From these facts, Michael suffered an "injury" within the meaning of the policy. Whether his injury was the immediate cause of his death, and whether his death was direct and independent of disease or bodily infirmity, are separate inquires that the Court will address below.

**(2) A Material Dispute of Fact Remains as to Whether Michael's Accidental Injury Caused his Death**

Minnesota Life's AD&D policy requires that "death or dismemberment results . . . from an accidental injury . . . ." ECF Doc. 16, ¶ 10. When the cause of an insured's death is at issue, courts are "not required to search beyond the immediate proximate cause to find other causes more remote." *Marsh*, 70 Ill. App. 3d at 794. In other words:

> [T]he proximate and not a remote cause is the one to which the law looks. . . . The policy in the case at bar does not go so far as to require the court to search beyond the active, efficient, procuring cause [t]o a cause of a cause. When one single predominant agency is disclosed, directly producing as a natural and probable result the injury, which is accidental, and which operates independently of other like causes, then the effectual means required by the policy have been found.

> *Marsh*, 70 Ill. App. 3d at 795 (quoting *Bohacker v. Travelers' Ins. Co.*, 102 N.E. 342, 344 (1913).

Here, the parties disagree as to the cause of Michael's death. Plaintiff claims that Michael's death was caused by aspirated vomit obstructing his airway; Defendant asserts that

Michael died as a result of his seizure disorder. Although Plaintiff and Defendant offer differing opinions as to the most likely cause of Michael's death, they both concede that the actual cause of death is uncertain. *Compare* Bosacker Declaration, ECF Doc. 28-1, at 4 ("The cause of Mr. Mitchell's death is not certain. . . . Any of these [medical conditions] or an unrecognized diagnosis may have caused his death."), *with* Frederick Deposition, ECF Doc. 18-9, at 12 ("[M]y opinion was that [aspiration] was the most likely cause of death looking at that scenario, but it could have been any number of things."). Thus, a factual dispute exists as to the cause of Michael's death. The factual dispute is material because Plaintiff "has the burden of proving that decedent died as a result of an accidental bodily injury within the terms of the subject policy." *Wahls v. Aetna Life Ins. Co.*, 122 Ill. App. 3d 309, 311 (1983). The differing opinions and conclusions of Dr. Bosacker and Dr. Frederick indicate that the medical records are "subject to conflicting interpretations." See *Rodeo v. Gillman*, 787 F.2d 1175, 1177 (7th Cir. 1986). Therefore, summary judgment is inappropriate. *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994) (non-movant need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact).

**(3) Because a Material Dispute of Fact Remains as to the Cause of the Insured's Death, the Court Cannot Determine Whether the Policy's Disease or Bodily Infirmity Exclusion Applies**

Having established that a material dispute of fact remains as to the cause of Michael's death, it may seem axiomatic that the Court cannot determine whether Michael's death resulted "directly and independently of disease or bodily infirmity." However, there are notable distinctions between the two inquiries that merit discussion. Specifically, the two inquiries differ as to which party bears the burden of establishing the causal relationship (or lack thereof) between the "disease or bodily infirmity" and death.

16

Plaintiff asserts that "[t]he burden is on the insurer to prove application of an exclusion from coverage." ECF Doc. 24, at 12. Minnesota Life argues that Plaintiff "inaccurately conflates the AD&D coverage requirements with coverage exclusions. . . . The definition of accidental death as independent from bodily infirmity is not an 'exclusion' that [Defendant] must prove to defeat recovery but rather a coverage term that Plaintiff must satisfy to bring Mitchell's death within the limited AD&D coverage." ECF Doc. 28, at 25. Thus, the issue is whether the policy's reference to "disease or bodily infirmity" is a coverage term or a coverage exclusion. If it is a coverage term, the Plaintiff bears the burden of establishing the loss falls within the defined scope of coverage. On the other hand, if the "disease or bodily infirmity" provision is a coverage exclusion, the burden rests with Minnesota Life to show that the exclusion applies. See *St. Michael's Orthodox Catholic Chruch v. Preferred Risk Mut. Ins. Co.*, 146 Ill. App. 3d 107, 109 (1986) ("[T]he insured has the burden of proving that his loss falls within the terms of his policy. . . . Once the insured has brought himself within the terms of his policy, then the insurer must prove the applicability of an exception in the coverage if it wishes to escape liability."); *Rich*, 226 Ill. 2d at 379 ("An exclusion in an insurance policy serves the purpose of taking out persons or events otherwise included within the defined scope of coverage."). Recall that the policy provided:

> Accidental death or dismemberment by accidental injury as used in this supplement means that your death or dismemberment results, *directly and independently of disease or bodily infirmity*, from an accidental injury which is unexpected and unforeseen.
> The injury must occur while your coverage under this supplement is in force. Your death or dismemberment must occur within 265 days after the date of the injury and while your coverage under this supplement is in force.
> In no event will we pay the accidental death or dismemberment benefit where your death or dismemberment results from or is caused directly by any of the following:
>> (1) intentionally self-inflicted injury, suicide or attempted suicide, whether sane or insane; or

(2) your commission of an assault or a felony or being engaged in an illegal
    occupation; or
(3) *bodily or mental infirmity, illness or disease*; or
(4) medical or surgical treatment; or
(5) war or any act of war, whether declared or undeclared if you are
    currently serving in the military or your military service terminated no
    longer than six months prior to your dismemberment.

ECF Doc. 16-1, at 27 (emphasis added).

Viewed in isolation, Minnesota Life's artful inclusion of "infirmity" and "disease" in both the first sentence (the "coverage clause") and the last sentence (the "exclusion clause") makes the emphasized language susceptible to categorization as both a coverage term and a coverage exclusion. In order to "ascertain the intent of the parties and the meaning of the words used in the insurance policy, the court must construe the policy as a whole . . . ." *Ins. Corp. of Hanover v. Shelborne Associates*, 389 Ill. App. 3d 795, 799 (2009). Here, the policy states that the accidental death and dismemberment benefit becomes payable "upon receipt at our home office of written proof satisfactory to us that you died or suffered dismemberment as a result of an accidental injury." ECF Doc. 16-1, at 27. Construing the policy as a whole, Minnesota Life's policy provides additional indemnity for accidental injuries resulting in death or dismemberment. Thus, Plaintiff must show that the accidental injury, aspiration of vomit, resulted in Michael's death. *Johnson Press of Am., Inc. v. N. Ins. Co. of New York*, 339 Ill. App. 3d 864, 871–72 (2003) ("[T]he insured bears the initial burden of presenting, through the papers on file, sufficient facts establishing a prima facie case.").

Once the insured establishes that the loss falls within the scope of coverage, "the burden shifts to the insurer to show that the loss resulted from a peril expressly excluded from coverage." *Id.* (citing *Wallis v. Country Mutual Insurance Co.*, 309 Ill. App. 3d 566 (2000)); *Santa's Best Craft, LLC v. St. Paul Fire & Marine Ins. Co.*, 611 F.3d 339, 347 (7th Cir. 2010)

("Insurers have the burden of proving that an exclusion applies."); *Pekin Ins. Co. v. Miller*, 367 Ill. App. 3d 263, 267 (2006) ("It is the insurer's burden to affirmatively demonstrate the applicability of an exclusion."). "An exclusion in an insurance policy serves the purpose of taking out persons or events otherwise included within the defined scope of coverage." *Gen. Ins. Co. of Am. v. Robert B. McManus, Inc.*, 272 Ill. App. 3d 510, 514 (1995); *Rich*, 226 Ill. 2d at 379 (same). Here, the policy contains five enumerated limitations to coverage for accidental injuries resulting in death. Those five limitations, including the limitation for death resulting from bodily or mental infirmity, illness or disease, serve "the purpose of taking out events otherwise included within the defined scope of coverage." *Id*. Minnesota Life's argument—that the use of "disease or bodily infirmity" in both the coverage clause and exclusion clause operates to shift the burden to Plaintiff—is unsupported by case law and the rules of contract construction.

First, Minnesota Life's position would create an arbitrary distinction where none currently exists. Under Minnesota Life's reading of the policy, insureds would have the burden of showing that the accidental death was not the result of "disease or bodily infirmity," but Minnesota Life would have the burden of establishing that the accidental death was the result of "bodily or mental infirmity, illness or disease." Such a result would create unnecessary confusion, place conflicting burdens on the litigants, and require courts to draw a distinction between illness, disease, and infirmity.

Second, cases interpreting policies similar or identical to Minnesota Life's policy have consistently treated the clause as an exclusion from coverage. In *Marsh*, the policy provided coverage if an "Employee sustains bodily injuries solely through accidental means, and within 365 days thereafter suffers (loss of life) as a direct result of such bodily injuries *independently of all other causes . . . ." Marsh*, 70 Ill. App. 3d at 791 n.1 (emphasis added). The policy also

contained an exclusion: "however, that in no case shall any payment be made for death or any other loss which is . . . caused or contributed to by disease or bodily or mental infirmity . . . ." *Id.* Despite the fact that the coverage clause included the phrase "independently of all other causes," the court stated that "it is the duty of the insurer to plead and prove a particular loss is within the exception of an exclusionary clause." *Id.* at 794.

Similarly, in *Rich*, the policy provided for lifetime benefits for disability caused by "Injury," but limited benefits to five years for "Injury which is a direct or indirect result of physical or mental infirmity, illness, or disease of any kind, or medical or surgical treatment therefor . . . ." 226 Ill. 2d at 362. The Illinois Supreme Court noted:

> In the present case, *Christ* appears conclusive on this point and indicates that plaintiff incurred "accidental bodily injury." (citation omitted) Accordingly, plaintiff would be entitled to lifetime disability benefits absent any limitations or exclusions in the policy. Indeed, reading the policy as a whole, *the exclusion would be superfluous if it limited losses which the policy's general insuring clause did not cover*. "An exclusion in an insurance policy serves the purpose of taking out persons or events otherwise included within the defined scope of coverage." (citation omitted). Therefore, the issue is whether or not the injury falls within the policy exclusion for illness or disease, or medical or surgical treatment therefor.

*Rich v. Principal Life Ins. Co.*, 226 Ill. 2d 359, 379 (2007) (emphasis added).

As in *Rich*, Minnesota Life's policy exclusion for "bodily or mental infirmity, illness or disease" would be superfluous if it sought to limit losses that were not covered in the general insurance clause. *Id.*; *Gen. Ins. Co. of Am. v. Robert B. McManus, Inc.*, 272 Ill. App. 3d 510, 514 (1995). In other words, if the phrase "directly and independently of disease or bodily infirmity" is "a coverage term that Plaintiff must satisfy to bring Mitchell's death within the limited AD&D coverage," the similarly worded exclusion for "bodily or mental infirmity, illness or disease" would be unnecessary and redundant. Minnesota Life's strained reading of the policy runs counter to the rule that "[i]nsurance policies should be construed as a whole, giving effect to

every part, as far as it is possible." *Hartford Acc. & Indem. Co. v. Case Found. Co.*, 10 Ill. App. 3d 115, 121 (1973).

Finally, Minnesota Life's interpretation of "directly and independently of disease or bodily infirmity" as a coverage term runs counter to Minnesota Life's own interpretation of the same policy in *Schroeder v. Minnesota Life Ins. Co.*, Case No. 06-2915, 2007 WL 1169706 at *1 (N.D. Ill. 2007). In that case, the insured had a seizure while driving. She pulled her car to the side of the road, but before witnesses could assist her, she unintentionally pressed the accelerator and drove into a tree. The insured died from her injuries shortly after. *Id*. The beneficiary brought suit against Minnesota Life and moved for summary judgment before the close of discovery. Minnesota Life's response argued that "the *disease exclusion* of the policy applies because the insured's seizure disorder played a role in her death." *Schroeder*, Case No. 06-2915, ECF Doc. 20, at 8 (N.D. Ill. 2007) (emphasis added). Notably absent from Minnesota Life's response was any indication that the "disease or bodily infirmity" clause was a coverage requirement that plaintiff must prove. The court granted summary judgment in favor of the plaintiff, stating:

> Nicholson may have had a disease—a seizure disorder—and that disease might have led to her depressing the accelerator while on the side of the road, which in turn led her to collide with the tree. That, however, does not make the seizure disorder a cause of her death within the meaning of her insurance policy. As the Court stated at the outset of this discussion, with an insurance policy term of this type, only the immediate cause of death matters, not any underlying illness or infirmities that might have contributed to the death by producing the conditions necessary for death to occur.
>
> *Id*. at *4.

In sum, the insured's aspiration of vomit constituted an injury within the meaning of the AD&D policy. However, a material dispute of fact remains as to the immediate cause of Michael's death. Because the factual dispute bears directly on the issue of whether Michael's injury was the immediate cause of his death, summary judgment is not appropriate.

## CONCLUSION

For the reasons stated above, Defendant's Motion [15] for Summary Judgment is Denied.


Signed on this 9th day of August, 2016.


s/ James E. Shadid
James E. Shadid
Chief United States District Judge