## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JAMIE TROEGER, Administrator of the Estate of Gayle Mitchell, Deceased, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 14-1083 |
| MINNESOTA LIFE INSURANCE COMPANY, | ) ) ) | |
| Defendant. | ) ) | |

## ORDER AND OPINION

This matter is now before the Court on Defendant's [34] Motion *in Limine* to Exclude Expert Opinion Testimony. For the reasons set forth below, Defendant's Motion [34] is DENIED.

### BACKGROUND

On July 20, 2002, Michael Mitchell fractured his neck after falling head-first into Kickapoo Creek. The fracture resulted in quadriplegia, or paralysis of all four extremities. In September 2005, Michael became a resident at Rose Garden Care Center ("Rose Garden"), a residential care facility in Peoria Heights, Illinois. He developed several medical conditions after his paralysis, including seizure disorder, depression, hypertension, obesity, dyslipidemia, bowl mobility disorder, gastroesophageal reflux disease ("GERD"), deep venous thrombosis, spasticity and chronic pain.

On at least four occasions between 2005 and 2006, Michael was found "non-responsive" by caretakers at Rose Garden. On June 24, 2006, Michael was admitted to the intensive care unit at Proctor Hospital for respiratory failure after he became unresponsive and stopped breathing

during ambulance transport to the hospital. In August 2006, Michael was transferred to OSF Saint Francis Medical Center ("OSF") when he was found unresponsive and caretakers were unable to feel a pulse. Michael was again found unresponsive by Rose Garden caretakers and transferred to OSF in September 2006. He was successfully resuscitated on each occasion.

On July 28, 2007, Michael began "actively seizing" at Rose Garden. He was initially breathing on his own, but stopped breathing. Rose Garden called paramedics, and Advanced Medical Transport ("AMT") transferred Michael to OSF Hospital. AMT paramedics documented Michael's condition during transport, noting "no evidence of trauma" in any location and an "unremarkable" physical examination. ECF Doc. 16, ¶ 22. When paramedics attempted to intubate Michael, they suctioned his airway and aspirated foreign material. ECF Doc. 28, at 13. Michael could not be resuscitated and was pronounced dead at OSF Hospital. Dr. Richard C. Frederick was the emergency room physician who treated Michael at OSF on July 28, 2007. Dr. Frederick signed the medical records prepared by a resident which noted, under the heading of *Initial Physical Exam*, "General—no evidence of trauma . . . Head/Neck—atraumatic . . . Extremities—no signs of trauma." See ECF Doc. 16-10. Those records also indicated that Michael had vomit on his face. On October 18, 2007, a Coroner's Inquest into Michael's death was held by Peoria County Coroner Johnna Ingersoll. The jury found that Michael's death was "natural" from "seizure disorder."

Michael, as a former employee of the State of Illinois, obtained life insurance coverage under a group policy for state employees. The life insurance policy was issued by Minnesota Life Insurance Company ("Minnesota Life") and included Accidental Death and Dismemberment ("AD&D") coverage. Minnesota Life paid Michael's wife, Gayle Mitchell, $156,500 pursuant to the policy's Basic Life and Optional Life coverage. However, Minnesota Life declined to pay the

additional $156,500 under the AD&D double indemnity provision. The AD&D provision of the policy states:

> Accidental death or dismemberment by accidental injury as used in this supplement means that your death or dismemberment results, directly and independently of disease or bodily infirmity, from an accidental injury which is unexpected and unforeseen.

> ECF Doc. 16, ¶ 10.

The policy also stated "injury must occur while your coverage under this supplement is in force" and "death or dismemberment must occur within 365 days after the date of the injury and while your coverage under this supplement is in force." *Id.*; ECF Doc. 16-1, at 27. The AD&D policy further provided that "[i]n no event will [Minnesota Life] pay the accidental death or dismemberment benefit where your death or dismemberment results from or is caused directly by any of the following . . . (3) bodily or mental infirmity, illness or disease; or (4) medical or surgical treatment . . . ." *Id.*

On October 14, 2014, Plaintiff provided her Rule 26(a) initial disclosures, which identified "Richard C. Frederick, M.D." as an individual likely to have discoverable information on the subject of "[d]iagnosis and treatment of Michael Mitchell when he arrived at the hospital, and his death." ECF Doc. 22, at 2. Plaintiff did not disclose Dr. Frederick as an expert witness. The Court's March 27, 2015, scheduling order provided that Plaintiff's expert disclosure was due by September 7, 2015, with depositions to be completed by October 7, 2015. On January 21, 2015, the Court granted Plaintiff's motion for an extension of time and set a discovery deadline of March 7, 2016. Plaintiff scheduled a deposition of Dr. Frederick and provided him with the medical records from OSF and AMT. Plaintiff's counsel asserts that he "learned Dr. Frederic[k]'s [aspiration] opinion based on the records was the likely cause of death was aspiration from

vomiting in the 10 minute conversation he had before the deposition was finally taken on March 4, 2016."

On March 18, 2016, Defendant moved to exclude Dr. Frederick's undisclosed expert testimony, arguing that Plaintiff failed to disclose Dr. Frederick as an expert witness under Fed. R. Civ. P. 26(a)(2), and failed to include either a written report under Fed. R. Civ. P 26(a)(2)(B) or a summary of expected testimony under Fed. R. Civ. P. 26(a)(2)(C). See ECF Docs. 17, 18. Defendant further argued that Dr. Frederick's testimony was unreliable under *Daubert*. Plaintiff's response argued that Dr. Frederick's opinion on the cause of death was a "pleasant surprise," and that "Plaintiff's Initial Disclosures disclosed Dr. Frederic[k] as a witness to testify on the diagnosis and treatment of Mitchell and death" and the initial disclosures also provided copies of the medical records. ECF Doc. 20-1, at 20. That, Plaintiff argued, was "all Rule 26(a)(2)(C) requires." *Id.*

On July 8, 2016, a status conference was held and the Court granted Plaintiff's motion to amend the Complaint in order to name Minnesota Life, rather than Securian, as Defendant. The Court also denied Defendant's motion to exclude Dr. Frederick's testimony, allowed Minnesota Life to depose Dr. Frederick, and required Plaintiff's counsel to make an appropriate certification or disclosure under Fed. R. Civ. P. 26(a)(2)(B) or (C). Defendant was granted leave to supplement their retained expert disclosure after Dr. Frederick was deposed, and the Court reserved ruling on Defendant's motion for costs and fees. On August 9, 2016, the Court issued an Order and Opinion denying Defendant's motion for summary judgment. After the final pretrial conference on October 21, 2016, Defendant filed a motion *in limine* to exclude opinion testimony from Dr. Frederick. See ECF Doc. 34. Defendant's motion reasserts the objections in

the prior motion that were denied, and further challenges the admissibility of Dr. Frederick's

opinion testimony under Fed. R. Evid. 702 and *Daubert*.

### STANDARD OF REVIEW

Rule 26 of the Federal Rules of Civil Procedure sets forth the disclosure requirements for

witnesses. Rule 26(a)(1)(A) provides that fact witnesses—anyone likely to have discoverable

information that the disclosing party may use to support its claims or defenses, unless solely for

impeachment—must be disclosed by sending the name, address, and phone number of each

potential witness to the opposing party. *Musser v. Gentiva Health Servs.*, 359 F.3d 751, 756 (7th

Cir. 2004). In addition to and separate from Rule 26(a)(1)(A) disclosures, Rule 26(a)(2)(A)

requires a party to "disclose to the other parties the identity of any witness it may use at trial to

present evidence under Federal Rule of Evidence 702, 703, or 705." Fed. R. Civ. P. 26(a)(2)(A).

Under Rule 26 (a)(2)(B),  the disclosure of expert witnesses who are "retained or

specially employed to provide expert testimony in the case or one whose duties as the party's

employee regularly involve giving expert testimony" must be accompanied by a written report

that is prepared and signed by the witness. The expert's report must include:

> **(i)** a complete statement of all opinions the witness will express and the basis and
> reasons for them;
> **(ii)** the facts or data considered by the witness in forming them;
> **(iii)** any exhibits that will be used to summarize or support them;
> **(iv)** the witness's qualifications, including a list of all publications authored in the
> previous 10 years;
> **(v)** a list of all other cases in which, during the previous 4 years, the witness
> testified as an expert at trial or by deposition; and
> **(vi)** a statement of the compensation to be paid for the study and testimony in the
> case.

> Fed. R. Civ. P. 26(a)(2)(B).

However, expert witnesses not "retained or specially employed to provide expert testimony in

the case or one whose duties as the party's employee regularly involve giving expert testimony"

are not required to provide a Rule 26(a)(2)(B) written report. Rather, Rule 26(a)(2)(C) requires

only that the disclosure state "the subject matter on which the witness is expected to present

evidence under Federal Rule of Evidence 702, 703, or 705; and a summary of the facts and

opinions to which the witness is expected to testify."

"The exclusion of non-disclosed evidence is automatic and mandatory under Rule

37(c)(1) unless non-disclosure was justified or harmless." *Musser*, 356 F.3d at 758 (7th Cir.

2004). Rule 37(c) provides:

> **(c) Failure to Disclose, to Supplement an Earlier Response, or to Admit.**
> **(1)** ***Failure to Disclose or Supplement.*** If a party fails to provide information
> or identify a witness as required by Rule 26(a) or (e), the party is not allowed
> to use that information or witness to supply evidence on a motion, at a hearing,
> or at a trial, unless the failure was substantially justified or is harmless. In
> addition to or instead of this sanction, the court, on motion and after giving an
> opportunity to be heard:
> > **(A)** may order payment of the reasonable expenses, including attorney's
> > fees, caused by the failure;
> > **(B)** may inform the jury of the party's failure; and
> > **(C)** may impose other appropriate sanctions, including any of the orders
> > listed in Rule 37(b)(2)(A)(i)-(vi).

Fed. R. Civ. P. 37(c).

A court considers the following factors when determining whether a party's failure to comply

with Rule 26 required disclosures was substantially justified or harmless:

(1) the prejudice or surprise to the party against whom the evidence is offered;
(2) the ability of the party to cure the prejudice;
(3) the likelihood of disruption to the trial; and
(4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date.

*Banister,* 636 F.3d at 833 (quoting *Westefer v. Snyder,* 422 F.3d 570, 585 n.1 (7th Cir. 2005)).

In addition to the expert disclosure obligations in Rule 26, Federal Rule of Evidence 702

provides four requirements expert witnesses must satisfy:

6

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>> **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>> **(b)** the testimony is based on sufficient facts or data;
>> **(c)** the testimony is the product of reliable principles and methods; and
>> **(d)** the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

"[I]t is the district court's role to act as a gatekeeper before admitting expert scientific testimony in order to 'ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" *Banister v. Burton*, 636 F.3d 828, 831 (7th Cir. 2011) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993)).

## ANALYSIS

### *(1) Whether Plaintiff's Failure to Disclose Warrants Exclusion*

Defendant first argues that Plaintiff's failure to timely disclose Dr. Frederick as an expert witness warrant excluding his expert opinion testimony at trial. Specifically, Defendant argues that Plaintiff failed to disclose Dr. Frederick as an expert witness under Fed. R. Civ. P. 26(a)(2), and failed to include either a written report under Fed. R. Civ. P 26(a)(2)(B) or a summary of expected testimony under Fed. R. Civ. P. 26(a)(2)(C). Defendant's Rule 26 disclosure argument raises the same issue that was addressed in their prior motion to exclude. See ECF Docs. 17, 18. At the status conference on July 8, 2016, the Court denied Defendant's motion to exclude Dr. Frederick's testimony under Rule 37, allowed Minnesota Life to depose Dr. Frederick, and required Plaintiff's counsel to make an appropriate certification or disclosure under Fed. R. Civ. P. 26(a)(2)(B) or (C). Defendant was granted leave to supplement their retained expert disclosure after Dr. Frederick was deposed, and the Court reserved ruling on Defendant's motion for costs and fees.

Here, Defendant's disclosure argument is identical to the argument previously raised and rejected in their prior motion to exclude, and they offer no justification as to why the Court should revisit the issue. Plaintiff satisfied Rule 26(a)(2)(C) by certifying that the facts and opinions contained in Dr. Frederick's first deposition were all the expected facts and opinions that he would testify to in any subsequent deposition, ECF Doc. 31, and Defendant was granted leave to supplement their expert report. Accordingly, Defendant's motion is denied as it relates to exclusion on the basis of Rule 26 disclosures.

*(2) Whether Dr. Frederick's Opinion Testimony Satisfies Rule 702 and Daubert*

Defendant next argues that the opinion testimony of Plaintiff's expert should be excluded under Fed. R. Evid. 702 and *Daubert*, reasoning that Dr. Frederick's opinions lack the required factual foundation and rest on an unreliable methodology. ECF Doc. 34, at 8. Specifically, Defendant argues that Dr. Frederick "was not provided and failed to consider key significant medical data impacting causation, including Mitchell's medical history, treatment records documenting his multiple medical conditions, and the Coroner's Inquest and Certificate of Death documenting findings on Mitchell's cause of death." *Id*. at 13. Second, Defendant argues that "Dr. Frederick's limited data compromised his ability to employ a reliable methodology," and because he was "unaware of the full nature and extent of Mitchell's medical conditions," he was "unable to engage in any differential analysis in arriving at his medical causation opinions." *Id*.

Federal Rule of Evidence 702 permits a "witness who is qualified as an expert by knowledge, skill, experience, training, or education" to give testimony only if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles or methods; and (d) the expert has reliably

applied the principles and methods to the facts of the case." *Higgins v. Koch Dev. Corp.*, 794 F.3d 697, 704 (7th Cir. 2015). At his deposition on March 4, 2016, Dr. Frederick opined that Michael Mitchell's death was likely caused by the aspiration of vomit into his airway. ECF Doc. 18-9, at 8. Dr. Frederick formed this opinion after reviewing the AMT records and OSF records from the date he treated Michael in the Emergency Department. *Id*. at 6.

Defendant argues that Dr. Frederick failed to consider the Coroner's Inquest, death certificate, and Michael's prior nursing home and medical history documenting his medical conditions. Yet Defendant's expert, Dr. Bosacker, makes only one reference to the Coroner's Inquest and death certificate in her report. See ECF Doc. 34-4, at 2 (noting Mrs. Mitchell's statement that Michael's seizures were "very debilitating and they were difficult on him"). Moreover, unlike an autopsy, which Dr. Frederick admitted was the "gold standard" for determining cause of death, ECF Doc. 18-9, at 9, the death certificate and transcript from the Coroner's Inquest do not provide any additional insight into the facts or circumstances of Michael's death. See ECF Doc.18-6.

Defendant also claims that Dr. Frederick failed to consider Michael's prior medical and nursing home records. A review of those records would have revealed that Michael was found unresponsive multiple times at the nursing home, and that he had a history of seizure disorder, depression, hypertension, obesity, dyslipidemia, bowl mobility disorder, gastroesophageal reflux disease ("GERD"), and deep venous thrombosis. However, Dr. Frederick was aware of Michael's seizure disorder from the AMT and hospital records. ECF Doc. 18-9, at 13. Dr. Frederick also acknowledged that GERD "put him in a higher risk of vomiting" *Id*., at 17. At his second deposition, the following exchange took place:

> Q. Doctor, when you mentioned earlier the most likely scenario without, of course, postmortem don't know, you mentioned a couple of things that were

potential causes. I think one you said was blood vessel blockage, tell me what you mean by that.

A. Could be a blood vessel blockage of your heart, he could have had a heart attack. A blood vessel blockage of the blood vessels going to your brain which would be a stroke, you know, those are just examples of other things that could cause death.

Q. And Mr. Mitchel had a number of risk factors for cardiac arrest, correct?

A. He did.

Q. Including his obesity?

A. Correct.

Q. He also had hypertension?

A. Correct.

Q. What is hypertension?

A. High blood pressure.

Q. And, of course, he has been a quadriplegic for five years, he also had not been exercising either?

A. Correct.

Q. And those are all risk factors of cardiac arrest?

A. Yes.

Q. Are there any facts that you see that would allow you to rule out cardiac arrest as the cause of Mr. Mitchell's death?

A. No.

Q. Mr. Mitchell also had a deep vein thrombosis, can you describe what that is?

A. Yeah, that is blood clots usually in your legs, although you can have it in your arms, blood clots in your legs.

Q. And what is the significance or what is the risk of having the blood clots, the deep vein thrombosis?

A. If they don't stay in your legs, then they go up into your lungs and that can cause a cardiac arrest, death as well.

. . . .

Q. Are there any facts that you have seen in the records that would allow you to rule out a blood clot going to Mr. Mitchell's lungs in this case?

A. No.

. . . .

Q. And did anything that you've looked at today or any of our discussions today, did it change any of the opinions that you had from your prior deposition?

A. Not substantively.

Q. And what do you mean by that?

A. Well, I mean, the – in the prior deposition if it was – I think the possibility of him dying from something else other than aspiration as being the actual event that caused his death, you know, all these other – and we've discussed some of these other options – all those other options are certainly there. And they certainly could be the cause of death. Without doing a postmortem we simply don't know. And we also treat things like they are individual and isolated events, which they are not. For example, Mr. Mitchell could have had a blood clot on his lung that caused him to pass out because he's not getting enough oxygen to his lung. Then

when he passed out, he aspirated, blocked his airway and died. So is there – you – that same thing could have occurred with a heart attack, with a stroke, with a number of different causes. So saying that this one isolated event is the cause of death is making it a bit more simplistic than what the reality probably was.

. . . .

Q. Notwithstanding the issues that Ms. Herring has brought up here and asked you about with respect to other potential causes of death, is it still your opinion that the most likely explanation for the death of Mr. Mitchell was the aspiration that led to respiratory arrest and ultimately killed him?
A. It is.

ECF Doc. 34-3, at 15-16.

Dr. Frederick arrived at his conclusions based on the records from paramedics and the OSF records from the Emergency Department visit. In addition, Dr. Frederick relied on his substantial medical experience in emergency medicine. See *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) ("An expert's testimony is not unreliable simply because it is founded on his experience rather than on data."). Both Dr. Frederick and Dr. Bosacker relied almost entirely on the AMT and OSF Emergency Department medical records, and both doctors acknowledged that the cause of Michael's death was uncertain. Dr. Frederick concluded that the most likely cause of Michael's death was respiratory arrest due to aspiration of vomit; Dr. Bosacker opined that Michael died after he spontaneously stopped breathing and his heart stopped, and the presence of vomit was a result of unsuccessful efforts to resuscitate him. ECF Doc. 34-4, at 6. In essence, the experts disagree as to whether Michael vomited before or after his heart stopped beating.

Dr. Frederick's testimony will help the court interpret the medical evidence and resolve the dispute as to whether Michael's death was caused by aspiration. See *Higgins*, 794 F.3d at 704. He possesses knowledge and extensive experience as an emergency room physician. *Id*. Additionally, Dr. Frederick's testimony was "based on sufficient facts or data" because the AMT and OSF medical records provided the necessary information for him to conclude that Michael

11

likely died from aspirating vomit. Although Dr. Frederick did not consider the records of

Michael's prior medical and nursing home history, he testified that his aspiration opinion was not

dependent on any of Michael's specific medical conditions:

> For example, Mr. Mitchell could have had a blood clot on his lung that caused
> him to pass out because he's not getting enough oxygen to his lung. Then when he
> passed out, he aspirated, blocked his airway and died. So is there – you – that
> same thing could have occurred with a heart attack, with a stroke, with a number
> of different causes.

> ECF Doc. 34-3, at 15-16.

> Dr. Frederick also applied a reliable methodology—differential diagnosis based on

Michael's AMT and OSF records and the facts surrounding his hospitalization. See *Gayton v.*

*McCoy*, 593 F.3d 610, 618 (7th Cir. 2010) ("In reviewing the record, Dr. Weinstein used the

same type of equally reliable analysis as Dr. Moulton—differential diagnosis based on Taylor's

medical history and the facts surrounding his incarceration."). The fact that Dr. Frederick could

not determine Michael's cause of death with complete certainty does not make his testimony

inadmissible. *Gayton*, 593 F.3d at 619 ("[A]n expert need not testify with complete certainty

about the cause of an injury; rather he may testify that one factor could have been a contributing

factor to a given outcome."). Finally, Dr. Frederick provided a sufficient scientific basis for his

position that Michael's aspiration of vomit was the most likely cause of death. *Higgins*, 794 F.3d

at 704. Thus, Dr. Frederick's testimony meets the admissibility requirements of Rule 702 and

*Daubert*.

**CONCLUSION**

For the reasons stated above, Defendant's Motion [34] *in Limine* to Exclude Expert Opinion Testimony is DENIED.


Signed on this 9th day of November, 2016.

s/ James E. Shadid
James E. Shadid
Chief United States District Judge

13