## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| JAMIE TROEGER, Administrator of the Estate of Gayle Mitchell, Deceased,<br><br>Plaintiff,<br><br>v.<br><br>MINNESOTA LIFE INSURANCE COMPANY,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)        Case No. 14-1083 |

# ORDER AND OPINION

This matter is now before the Court after a bench trial on November 14, 2016, between Plaintiff Jamie Troeger, Administrator for the estate of Gayle Mitchell, and Defendant Minnesota Life Insurance Company. As set forth in the following Findings of Fact and Conclusions of Law, the Court finds that Plaintiff has established that Mr. Mitchell's death was caused by an accidental injury within the meaning of the policy. Further, the Court finds that Defendant has failed to establish the applicability of a policy exclusion to bar coverage. Therefore, judgment will enter in favor of Plaintiff in the amount of $156,500, with the Court reserving ruling on the issue of prejudgment interest pending supplemental briefing as directed below.

### BACKGROUND[1]

On July 20, 2002, Michael Mitchell fractured his neck after falling head-first into Kickapoo Creek. The fracture resulted in quadriplegia, or paralysis of all four extremities. In September 2005, Michael became a resident at Rose Garden Care Center ("Rose Garden"), a

---

[1] The following facts are taken from this Court's prior orders denying Defendant's motion for summary judgment and motion *in limine* to exclude expert opinion testimony.

residential care facility in Peoria Heights, Illinois. He developed several medical conditions after his paralysis, including seizure disorder, depression, hypertension, obesity, dyslipidemia, bowl mobility disorder, gastroesophageal reflux disease ("GERD"), deep venous thrombosis, spasticity and chronic pain.

On at least four occasions between 2005 and 2006, Michael was found "non-responsive" by caretakers at Rose Garden. On June 24, 2006, Michael was admitted to the intensive care unit at Proctor Hospital for respiratory failure after he became unresponsive and stopped breathing during ambulance transport to the hospital. In August 2006, Michael was transferred to OSF Saint Francis Medical Center ("OSF") when he was found unresponsive and caretakers were unable to feel a pulse. Michael was again found unresponsive by Rose Garden caretakers and transferred to OSF in September 2006. He was successfully resuscitated on each occasion.

On July 28, 2007, Michael began "actively seizing" at Rose Garden. He was initially breathing on his own, but stopped breathing. Rose Garden called paramedics, and Advanced Medical Transport ("AMT") transferred Michael to OSF Hospital. AMT paramedics documented Michael's condition during transport, noting "no evidence of trauma" in any location and an "unremarkable" physical examination. ECF Doc. 16, ¶ 22. When paramedics attempted to intubate Michael, they suctioned his airway and aspirated foreign material. ECF Doc. 28, at 13. Michael could not be resuscitated and was pronounced dead at OSF Hospital. Dr. Richard C. Frederick was the emergency room physician who treated Michael at OSF on July 28, 2007. Dr. Frederick signed the medical records prepared by a resident which noted, under the heading of *Initial Physical Exam*, "General—no evidence of trauma . . . Head/Neck—atraumatic . . . Extremities—no signs of trauma." See ECF Doc. 16-10. Those records also indicated that Michael had vomit on his face. On October 18, 2007, a Coroner's Inquest into Michael's death

2

was held by Peoria County Coroner Johnna Ingersoll. The jury found that Michael's death was "natural" from "seizure disorder."

Michael, as a former employee of the State of Illinois, obtained life insurance coverage under a group policy for state employees. The life insurance policy was issued by Minnesota Life Insurance Company ("Minnesota Life") and included Accidental Death and Dismemberment ("AD&D") coverage. Minnesota Life paid Michael's wife, Gayle Mitchell, $156,500 pursuant to the policy's Basic Life and Optional Life coverage. However, Minnesota Life declined to pay the additional $156,500 under the AD&D double indemnity provision. The AD&D provision of the policy states:

> Accidental death or dismemberment by accidental injury as used in this supplement means that your death or dismemberment results, directly and independently of disease or bodily infirmity, from an accidental injury which is unexpected and unforeseen.

ECF Doc. 16, ¶ 10.

The policy also stated "injury must occur while your coverage under this supplement is in force" and "death or dismemberment must occur within 365 days after the date of the injury and while your coverage under this supplement is in force." *Id.*; ECF Doc. 16-1, at 27. The AD&D policy further provided that "[i]n no event will [Minnesota Life] pay the accidental death or dismemberment benefit where your death or dismemberment results from or is caused directly by any of the following . . . (3) bodily or mental infirmity, illness or disease; or (4) medical or surgical treatment . . . ." *Id.*

On August 9, 2016, the Court issued an Order and Opinion denying Defendant's motion for summary judgment. After the final pretrial conference on October 21, 2016, Defendant filed a motion *in limine* to exclude opinion testimony from Dr. Frederick. See ECF Doc. 34. Defendant's motion reasserted the objections in the prior motion that were denied, and further

challenged the admissibility of Dr. Frederick's opinion testimony under Fed. R. Evid. 702 and

*Daubert*. On November 9, 2016, the Court denied Defendant's motion. ECF Doc. 36. At a bench

trial on November 14, 2016, Plaintiff presented exhibits of Dr. Frederick's deposition testimony,

where he opined that the most likely cause of Michael's death was aspiration of vomit resulting

in respiratory arrest. Minnesota Life called retained expert Dr. Bosacker, who testified that

Michael's death was not caused by aspiration and opined that Michael's death was likely caused

by one of his medical conditions.

## STANDARD OF REVIEW

In Illinois, "[t]he insured has the burden of proving that his loss comes within the terms

of his insurance policy." *Roberts v. Allstate Life Ins. Co.*, 243 Ill. App. 3d 658, 660 (1993);

*Kolowski v. Metro. Life Ins. Co.*, 35 F. Supp. 2d 1059, 1061 (N.D. Ill. 1998). "Once the insured

has brought himself within the terms of his policy, then the insurer must prove the applicability

of an exception in the coverage if it wishes to escape liability." *St. Michael's Orthodox Catholic

Chruch v. Preferred Risk Mut. Ins. Co.*, 146 Ill. App. 3d 107, 109 (1986)

Illinois courts have adopted a liberal interpretation of the phrase "accidental means" in

insurance policies, construing the term to be synonymous with "accidental result." *Russell*, 108

Ill. App. 3d at 420 (citing *Taylor*, 11 Ill. 2d at 230)). In Illinois, "the concept of causation with

respect to the analysis of life insurance policies is more circumscribed than in tort law . . . only

the immediate cause of the insured's death matters . . . not any underlying illness or infirmities

that might have contributed to the death by producing the conditions necessary for death to

occur." *Schroeder v. Minnesota Life Ins. Co*., Case No. 06-2915, 2007 WL 1169706 at*2-4 (N.D.

Ill. 2007) (citing *Russell v. Metro. Life Ins. Co.*, 108 Ill. App. 3d 417 (1982)). In other words,

Illinois courts "need not seek out . . . the cause of the cause." *Russell*, 108 Ill. App. 3d at 419

(citing *Marsh v. Metropolitan Life Ins. Co*., 70 Ill. App. 3d 790, 796 (1979)).

**FINDINGS OF FACT**

*The Most Likely Cause of Michael's Death was Respiratory Arrest Resulting from Aspiration of Foreign Material into his Airway*

The records from Rose Garden indicate that Michael was found unresponsive but breathing independently at 5:10 p.m. The nurse called for an ambulance and initiated CPR after he stopped breathing until AMT arrived at 5:17 p.m. Def. Ex. 1, at 6. The AMT records pick up where Rose Garden's records end, noting that another EMS crew already at Rose Garden performed CPR and administered oxygen to Michael with a Bag Valve Mask ("BVM") at 5:16 p.m. Joint Ex. 4, at 4. AMT paramedics arrived shortly thereafter, and Michael was placed on a stretcher and taken to the ambulance. At 5:24 p.m., AMT paramedics attempted unsuccessfully to intubate the patient while in transit to OSF, noting "suction needed, visualization 0%" and a minute later, "suction: upper airway . . . device: adult suction catheter, aspirate: foreign matter." *Id*. at 3. OSF records document that Michael arrived at the hospital with "large amount of vomitus present on face." Joint Ex. 6, at 2.

Plaintiff relied on Dr. Frederick. Dr. Frederick was an emergency room physician at OSF St. Francis Hospital in Peoria and one of the treating physicians for Mr. Mitchell. He completed his residency in 1979 and became board certified in emergency medicine in 1986. He was the department chair during his last two years of full time work. He was not a retained expert in this case. Defendant relied on the opinion of Dr. Bosacker. Dr. Bosacker began her residency in the United States Navy, finished it at the University of Florida, and became board certified in faculty medicine in 2005. She saw patients at Fairview Lakes in Minnesota from 2005 to 2011 before

5

accepting employment with Securian Financial Group in April of 2011.[2] She currently serves as

the Chief Medical Director for Securian.

Plaintiff and Defendant present conflicting interpretations of the records from AMT and

OSF documenting the events leading up to Michael's death. At Dr. Frederick's deposition on

September 19, 2015, the following exchange took place:

> Q. And, Doctor, if I understood your prior testimony, is it your opinion that the aspiration is what resulted in Mr. Mitchell's death?
> A. It's my opinion that that is the most likely scenario. If you look at the end part of my deposition when we talked about that, I said without actually doing a postmortem we don't know. He could have had his coronary arteries blocked off, he could have had a blockage to the blood vessels of his brain, he could have had, you know, a multitude of things that could have occurred to cause his demise. But without doing a postmortem and looking and having a pathologist look and say this is what the cause of death was, there's a certain amount of speculation that is inherent in that. . . .
> Q. So the most likely scenario – your best guess is the aspiration?
> A. Right.
> Q. And if there's not complete blockage so air is still going in and out, how is it that the aspiration causes death?
> A. Well, because there wasn't – at this point in everything that we talked about in our resuscitative efforts or in the ambulance's resuscitative efforts, you are taking an artificial device, that bag, and you're pushing – forcing air in there. So if you would – if somebody was – if he's laying there and he vomited premortem, and I think that's going to be important in your – in the determination here. If he vomited and then that vomit goes back, it sits in this area, goes down into the trachea and/or even just sits in that area by itself and it is a barrier to breathing. If I've got a bunch of fluid or fluid or something sitting there like this, the air can't get in past that. Now, I can force air in past that so when I put the bag on I'm doing that. In fact, many times when we do resuscitative efforts – and I'm sure they did it in this, is they suctioned that area first. So if – it's one thing for to artificially force air past that and it's another thing for the patient to be able to get air past that on their own.

> Pla. Ex. 2, at 40-41.

> Q. And did anything that you've looked at today or any of our discussions today, did it change any of the opinions that you had from your prior deposition?
> A. Not substantively.
> Q. And what do you mean by that?

---

[2] Securian is the parent company of Defendant, Minnesota Life Insurance Company.

A. Well, I mean, the – in the prior deposition if it was – I think the possibility of him dying from something else other than aspiration as being the actual event that caused his death, you know, all these other – and we've discussed some of these other options – all those other options are certainly there. And they certainly could be the cause of death. Without doing a postmortem we simply don't know. And we also treat things like they are individual and isolated events, which they are not. For example, Mr. Mitchell could have had a blood clot on his lung that caused him to pass out because he's not getting enough oxygen to his lung. Then when he passed out, he aspirated, blocked his airway and died. So is there – you – that same thing could have occurred with a heart attack, with a stroke, with a number of different causes. So saying that this one isolated event is the cause of death is making it a bit more simplistic than what the reality probably was.

Q. The aspiration that [was] your opinion was the most likely cause of death, can you tell me whether that occurred before or after CPR was started?

A. No.

Q. Why not?

A. Well, if we just review what we just went over at 1520 – or 1720, 5:20, he was – they said they started the CPR, the resuscitation attempts were – the first mention of aspiration of foreign body were at 1724 and 1725. And so we've got a four to five-minute period where – between when they started CPR and when they noticed the aspiration. We don't know whether it was there when they started it. It was simply not noted on the record from the nursing home whether that was the case.

***

Q. Notwithstanding the issues that Ms. Herring has brought up here and asked you about with respect to other potential causes of death, is it still your opinion that the most likely explanation for the death of Mr. Mitchell was the aspiration that led to respiratory arrest and ultimately killed him?

A. It is.

Pla. Ex. 2, at 53-56.

Dr. Bosacker reaches a different conclusion in her reports. Joint Ex. 3. Specifically, Dr. Bosacker opined that "[o]n the day of his death, Mr. Mitchell likely experienced another unresponsive episode with cardiovascular slowing that led to a decreased oxygen level in his blood, a strain on his heart because of the low oxygen level and cardiac arrest." *Id*. at 5. Dr. Bosacker disagrees with Dr. Frederick's aspiration opinion, stating:

Dr. Frederick indicates that he believes Mr. Mitchell's death most likely resulted from aspiration, however there is no evidence Mr. Mitchell aspirated anything. If, after losing consciousness at the nursing center, Mr. Mitchell was not able to protect his airway, he may have had some seepage of saliva into his

7

posterior oropharynx, but at no time was his airway completely occluded. There are no records of medical personnel having difficultly visualizing Mr. Mitchell's airway due to foreign material. The EMS report indicates an oropharyngeal airway was easily placed and that Mr. Mitchell was ventilated with a bag-valve mask indicating a patent airway. Dr. Gaudio's intubation records do not include any mention of foreign material in Mr. Mitchell's airway. Dr. Gaudio was able to visualize Mr. Mitchell's vocal cords and introduce and secure an adult-size endotracheal tube without difficulty. If there was aspiration of respiratory secretions or of the small amount of vomitus that was noted on Mr. Mitchell's face during his resuscitation, there is no evidence that the volume of the aspirate was sufficient to block Mr. Mitchell's airway. Small amounts of respiratory secretions are commonly aspirated by persons with impaired swallowing such as those with quadriplegia and they are of minimal clinical significance. If a person aspirates respiratory or gastric secretions, it is possible that over a period of days he may develop a pneumonia due to the presence of those secretions in the lung. In Mr. Mitchell's situation, he lost consciousness as he had done multiple times in the years leading up to July 28, 2007 and he was breathing independently. There was no concern there was anything impeding air flow. His breathing stopped when his heart stopped, likely due to low oxygen levels.

There is no evidence Mr. Mitchell's airway was occluded at any time during his period of unresponsiveness and asystole on July 28, 2007. Records indicate the nursing staff noted Mr. Mitchell to be unresponsive at 1700. At that time, the nursing staff was not able to get his vital signs, but he was noted to be breathing independently. This spontaneous independent breathing indicates Mr. Mitchell had a patent airway and that circulation was intact. His blood pressure and heart rate may have been low and difficult to obtain or the nursing staff may have had difficulty obtaining his vital signs because of his morbid obesity. Mr. Mitchell was noted to have stopped breathing at 1720. At that time, CPR was initiated.

Joint Ex. 3, at 5.

Based on the records, Dr. Frederick's testimony and Dr. Bosacker's report and testimony, the Court finds that the most likely cause of Michael's death was respiratory arrest resulting from aspiration of foreign material into his airway. AMT records indicate that paramedics suctioned foreign material from Michael's airway minutes after he stopped breathing. Dr. Frederick explained in detail how even a small amount of vomit or fluid could have blocked or significantly compromised Michael's airway and that Michael would not be able to clear his airway of the aspirate given his quadriplegia and unresponsive state. He also explained how,

unlike Michael's shallow respirations, first responders administering oxygen through the BVM would have been able to force air through the aspirate. Dr. Frederick conceded that without a postmortem he could not rule out other causes of death, but maintained that aspiration was the most likely cause. Pla. Ex. 2, at 53-56. His testimony was consistent throughout both of his depositions.

On the other hand, Dr. Bosacker's report, and testimony, are less convincing and contained numerous inconsistencies. For example, Dr. Bosacker concluded that "there is no evidence that Mr. Mitchell aspirated anything" or that his "airway was occluded at any time during his period of unresponsiveness and asystole," reasoning that "[t]here are no records of medical personnel having difficulty visualizing Mr. Mitchell's airway due to foreign material" and the fact that he was ventilated with a BVM indicated he had no obstruction to his airway. *Id*. However, the AMT records indicate otherwise, documenting "suction needed, visualization 0%" and "suction: upper airway . . . device: adult suction catheter, aspirate: foreign matter." Joint Ex. 4, at 3. And although Dr. Bosacker's report reasoned that the successful use of the BVM indicated his airway was unobstructed, she testified at trial that "if there was vomit in his airway even if they didn't have suction hooked up, as soon as they used a bag valve mask the pressure from the airflow from the bag would remove a fluid that could potentially obstruct the airway out of the way."[3]

Dr. Bosacker's report also concluded that Michael's airway would not have been occluded by the "small amount of vomitus that was noted on [his] face during his resuscitation" because "there is no evidence the volume of the aspirate was sufficient to block [his] airway."

---

[3] In contrast, her report states that "if there had been an airway obstruction, air from the bag-valve mask would not have entered Mr. Mitchell's airway, but would rather have escaped from the sides of the mask and the emergency personnel would likely have noted significant resistance in their efforts to ventilate Mr. Mitchell." Joint Ex. 3, at 6.

Joint Ex. 3, at 5. Yet the OSF records document that Michael arrived at the hospital with a "large amount of vomitus present on face." Joint Ex. 6, at 2. Finally, Dr. Bosacker's conclusion that Michael's airway was not obstructed before he entered cardiac arrest is based on the fact that CPR can cause vomiting, and air from the BVM was able to pass through his airway. However, her report acknowledges that CPR is also the standard of care in unconscious adult choking victims, as "air displaced from the lungs with direct compression of the chest forces material blocking the airway up into the mouth, clearing the airway." Joint Ex. 3, at 6. In other words, aspiration blocking Michael's airway would have been cleared during the initial resuscitation attempts by Rose Garden nursing staff. This is an apparent attempt to have it both ways. Having testified that she disagreed with Dr. Frederick's opinion because "Mitchell's airway was never obstructed," further inconsistency comes from the question and answer as follows:

On Direct,

> Q. As long as there is some opening and some air passage . . . you would not have death as a result?
> A. Correct.
> Q. And again, when we referred to a partially obstructed [airway] would a partial obstruction cause death?
> A. No.

On Cross,

> Q. Even in a healthy individual, would you not agree, that there is some level of oxygen that needs to be brought in the body through breathing in order to keep life sustained, and then if you get below that level, even in a healthy person, they will eventually die if they are deprived long enough?
> A. Yes.

Dr. Frederick's opinion testimony was consistent throughout both depositions. In contrast, Dr. Bosacker's report, and testimony, included inconsistent statements, misstated some information from the records, and was simply not as credible as Dr. Frederick's in explaining the

possible causes of death. Accordingly, the Court finds that aspiration was the most likely cause of Michael's death.

**CONCLUSIONS OF LAW**

*Michael's Death Resulted from an Accidental Injury as Defined by the AD&D Policy*

The Court's prior Opinion denying Defendant's motion for summary judgment found that: (1) Michael suffered an accidental injury within the meaning of the AD&D policy; (2) a material dispute of fact remained as to whether Michael's accidental injury caused his death; and (3) because a material dispute of fact remained as to the cause of Michael's death, the Court could not determine whether the AD&D policy's disease or bodily infirmity exclusion applied. See ECF Doc. 32, at 16.

Because the factual dispute regarding the cause of Michael's death has now been resolved in Plaintiff's favor, the only remaining issue is whether Michael's death is nevertheless excluded from coverage under the policy's disease or bodily infirmity exclusion. As explained in the Court's prior Opinion, the burden is on Defendant to show that an exclusion from coverage applies. *Id*. at 18-19; *Santa's Best Craft, LLC v. St. Paul Fire & Marine Ins. Co.*, 611 F.3d 339, 347 (7th Cir. 2010). Here, the Court's finding that the immediate cause of Michael's death was caused by aspiration of vomit is dispositive. See *Schroeder v. Minnesota Life Ins. Co.*, Case No. 06-2915, 2007 WL 1169706 at *4 (N.D. Ill. 2007)("[O]nly the immediate cause of death matters, not any underlying illness or infirmities that might have contributed to the death by producing the conditions necessary for death to occur."). Thus, Defendant cannot meet its burden of establishing Michael's death was excluded from coverage.

11

*The Court Reserves Ruling on Plaintiff's Request for Prejudgment Interest*

Finally, Defendant objects to Plaintiff's claim for interest under Section 2 of the Illinois Interest Act. 815 ILCS 205/2. Specifically, Defendant asserts that Plaintiff cannot recover prejudgment interest because the requested relief was not stated in the Complaint and not raised in discovery. The Court reserves ruling on the issue of prejudgment interest pending supplemental briefing. The parties are directed to file supplemental briefs within 14 days of this Order.

## CONCLUSION

For the reasons stated above, judgment will enter in favor of Plaintiff in the amount of $156,500. The Court reserves ruling on the issue of prejudgment interest pending supplemental briefing as set forth above.

Signed on this 18th day of November, 2016.

s/ James E. Shadid
James E. Shadid
Chief United States District Judge